## MANDA WHITE *v.* THE STATE.

1. PRACTICE.— However reprehensible as a question of practice may be a ruling of the court in a dispute over privilege of counsel in argument, if such ruling inures to the benefit of the defendant, he cannot be heard to complain.

2. SAME.— But, on the other hand, if the argument addressed by counsel to the court upon a disputed question of law, is resorted to merely for the purpose of inflaming the passions of the jury, it is the duty of the court to interfere by peremptory order.

3. SAME.— Whenever a question as to the admissibility of evidence is to be discussed alone before the judge, the jury should be retired for the time. See this case for example.

4. PRACTICE IN THIS COURT.— This court will not revise the action of trial courts with reference to matters confided to their sound discretion, unless prejudice to the defendant is shown to have resulted from an abuse of such discretion.

5. EVIDENCE — IMPEACHMENT OF WITNESS.— The ancient rule that a party cannot impeach his own witness is so far modified in this State as that a party may attack the testimony of the witness in any manner except by proving his bad character. See the opinion *in extenso* for an elaborate discussion of the question.

6. SAME.— When a State's witness on a former trial has made statements contrary to those made on the trial pending, the State's counsel is authorized to interrogate the witness respecting such former different or contradictory statements.

7. CHARGE OF THE COURT.— Refusal of an instruction which directs the attention of the court to a proper issue, with proper modifications demanded by the case as made by the evidence, is error. See this case for example.

8. EVIDENCE.— See evidence held insufficient to support a conviction of murder in the second degree.

APPEAL from the District Court of Cooke. Tried below before the Hon. H. E. ELDRIDGE, Special Judge.

The appellant was indicted, with Charles Reed, for the murder of Frank White. The verdict against her was for murder in the second degree, with punishment assessed at five years' confinement in the State penitentiary. The parties and most of the witnesses were colored people.

Henry Bartee, colored, was the first witness introduced by the State. He testified in substance that he lived in Gainesville, occupying a house about fifty yards from that in which the deceased was killed. The witness had gone to bed, but was not asleep, when he heard three reports of fire arms. He got up, dressed, went out, and saw Reed running from the direction of the house in which the shots were fired. The witness proceeded to the house, found the deceased lying on the floor, dead; Jake Murrell and the defendant were present, the latter kneeling and holding the dead man's head in her lap. The deceased had on a blue overcoat, hat, pants and boots. The witness was of the impression that the defendant was dressed — she was halloaing and crying. There was a light in the room, and two beds; one spread on the floor, and the other on the bed-stead. When the witness saw Reed running from the house, the latter was in his shirt-sleeves, and had something across his arm, which witness took to be a coat. The deceased and the defendant were married, but did not live together at the time of the killing. Reed lived at the defendant's house, and he and defendant lived as man and wife. The witness saw the deceased and Reed together the night of the killing, near Hall's stable, going towards home. They were quarreling.

The cross-examination of the witness developed nothing material to the case. He had never seen the defendant and Reed in bed together, and only presumed they lived as man and wife because Reed stayed at the defendant's house.

Jake Murrell testified, for the State, that he lived near the defendant's house. On the night of the killing, he had been asleep, and was awakened by the shooting. He got out of bed and ran out of his house, and heard the defendant screaming. He then ran to her house and found the door standing partly ajar. The deceased was lying on the floor with his head towards the door. The

defendant was down by him, screaming and crying, and holding his head in her lap. The witness asked her three different times, " what is the matter? " but got no reply. He then asked her two or three times, " who did that? " She finally replied: " Charley Reed did it." The witness took the light and looked at the corpse. This brought him close to defendant and he looked into her face, but discovered no traces of tears.

Cross-examined this witness said that when he reached the house, the defendant had on white night clothes, and nothing else. The deceased had on a blue overcoat. The witness did not notice his other clothing. Some of the bed clothes on the pallet were on fire when the witness reached the house.

Maggie Moore was introduced by the State and testified that the defendant was at her house one or two evenings before the homicide. To the question "if the defendant did not tell her that she was going to have Frank White killed if it cost her a law-suit in hell?" the witness answered that " she said something of that kind."

Cross-examined this witness said that she did not know when she heard the defendant make the remarks quoted; did not know whether it was a week or a month before the killing. At the time, the defendant was at witness' house, and witness' husband was joking her about Frank White's breaking out her window lights and rocking her house. The defendant made the remarks in a joking manner, and the witness thought she was funning. She did not use the name of the deceased, nor did the witness know that she meant him.

Bill Moore corroborated his wife as to the statement alluded to, but on cross-examination said that the defendant was rather serious at the time, and grew more so as they "talked about it." The witness did not try to dissuade her from it, nor advise her against it in any way.

Witness related these facts to Pete Foreman, about two weeks before this trial.

Lee Stone, for the State, testified that he was at the defendant's house two or three evenings before the homicide, attempting to reconcile differences between her and her husband, the deceased.   To his advice to go back and live with him, she replied that she would not live with him to save his life; that he had treated her like a dog; had taken all of her best things, and that she would fix him yet.

Cross-examined the witness said that he did not know what the defendant meant by the expressions quoted.  The witness was a witness in the trial of Charles Reed for this same offense, but did not state these facts, because he was only asked by counsel whether or not the defendant said anything to him about killing the deceased.

Manda Davidson testified, for the prosecution, that she went to the defendant's house about four o'clock on the evening of the homicide, and found Dick Van, Charley Reed, and the defendant there, the latter standing near the stove where she had been ironing.   Reed had a pistol in his hand when the witness went into the house, which he dropped down by his side.   Dick Van had some balls in his hand.   Reed said something to him about the balls, which the witness did not understand.   When the remark was made about the balls, the defendant hunched Reed with her elbow, and said, "you negroes are all fools, any way."

The night of the killing, Reed came to Henry Bartee's house, where witness was staying, after all in the house had gone to bed, and asked if the defendant was there. Bartee's wife answered that she was not, and asked who he was.   He answered "never mind that; is Manda White here?"   It was late when this occurred, but the witness did not know the hour.   The latter part of this witness' testimony was corroborated by Patsey Bartee.

Rhoda Davidson testified, for the State, that she saw the defendant and the deceased together, at her house, on the day before the killing. The deceased came first and went off. Presently the defendant came, and shortly afterwards the deceased returned, and the two had a talk. The deceased wanted the defendant to return to and live with him. She told him that she was going to move to Mr. Fletcher's, and would talk to him further about it. They were talking in a friendly manner, and talked for about an hour and a half. On the evening of the killing the defendant again came to the house of the witness, and in a short time the deceased came. The two went out of the house, back of the kitchen, and had a talk. The defendant agreed that if the deceased would restore her things, she would try him once more. While the deceased and the defendant were in the house talking, Reed came into the room where the witness was, and threw a key into a chair and told witness to give it to the defendant. He then left without seeing deceased or defendant, and without being seen by them. The defendant and deceased got through talking, and left the house of the witness together about dark.

This witness stated, on cross-examination, that she understood that the key left by Reed was the key to the defendant's house, and she delivered it as requested by Reed. The defendant intended to move into a house at Mr. Fletcher's on the day succeeding the killing, and had fixed up for that purpose the day before.

Lee Foreman, on behalf of the State, testified that himself and Bartee saw a man and woman whom he took to be the defendant and the deceased near Hall's stable, after supper on the night of the killing. They were talking, and, as the witness and Bartee passed them, the man asked the woman to kiss him. She replied either, "what do I want to kiss you for?" or, "turn me loose, and I will"— the witness could not say which.

Lou Dixon, for the State, testified that on the night of and before the killing of the deceased, at about ten o'clock, the defendant came to her house, where several men were congregated. She passed to the door and beckoned to the witness. The witness went to the door, and the defendant asked her "have you seen that fellow?" Witness asked "what fellow?" And she replied "Charley Reed." The witness told her that she had not seen him in two or three days. The defendant then said to witness, "if any one asks you who I was looking for, tell them no one that you know of."

Cross-examined the witness stated that she did not know what the defendant wanted with Reed. She supposed that she was expected to make the answer quoted, in the event any of the men present should ask who the defendant was seeking. The defendant, on leaving witness' house, went towards Rhoda Davidson's house, where, as the witness understood, she obtained the key to her house from Reed. During her residence with the deceased, the defendant had often been to witness' house, looking for deceased, at a later hour than on the occasion referred to.

Edith Scott, for the State, testified that she was at defendant's house twice on the evening of the killing. The first time she went she saw defendant, Dick Van, Manda Davidson and Charley Reed, but did not see the latter with a pistol. At a later hour, about dusk, she went back, and met the defendant leaving. She saw Reed sitting by the stove, holding a pistol up to his mouth. No one else was present.

Cross-examined, the witness said that the pistol was a large one. She could not say whether it was an entire pistol or a part of a pistol. Reed made no effort to conceal it, and, when asked by the witness what he was doing with it, answered that he was liable to carry it. The defendant contemplated moving the day after the killing.

Dick Brockman was introduced by the State and testi-
fied that he occupied the north and the defendant the
south end of the same house. Their rooms were sepa-
rated by a thin partition, which did not reach the ceiling.
On the night of the homicide and before it occurred, Reed
came into the witness' room, and inquired for the de-
fendant, saying that he had heard that she and deceased
had become reconciled; that he and deceased had had
some words, and that he would stay in the house no longer.
The witness told him that if he thought best to leave,
"all right." He replied that he thought he had best move
out that night. The defendant came into the room at
this time, and she and Reed passed into her room to-
gether, closing the door. The witness heard them talk-
ing in the room, but could not understand what they
said. The witness went to sleep and was awakened by
the shooting, and went into the defendant's room, where
he found Murrell and Bartee. The defendant was on her
knees, holding the deceased's head. She had something
like a shawl around her shoulders. The witness could
not say that she was dressed.

On cross-examination this witness stated that shortly
after the shooting the defendant commenced screaming,
and screamed like a woman frightened near unto death.
She called to the witness to come into the room. There
were two beds in the room, one spread on the floor and the
other on a bed-stead. The deceased was lying with his
head towards the door and had on all of his clothes.

D. J. Taylor testified, for the State, that he was a
policeman at the time of the killing. He heard the shots
and went to the house, where he found several parties.
The defendant was sitting by the stove, and was, the
witness thought, dressed. She had on something like a
shawl. The witness searched for arms but found none in
the house, nor did he find any bullet holes in the floor.

On cross-examination he identified a club exhibited as

one he found in the room.  The door to the room was shattered and looked like it had been struck by lightning. It had been broken in from the outside, and apparently the breaking was recent.  The deceased had no arms about his person.

Mark Gibson, for the defense, testified to witnessing a quarrel between deceased and Reed a few days before the killing.  Reed declined to fight, saying that he had been sick or drunk, and was not able, and turned off.  The deceased slapped him on the shoulder and said: " God d—n you, I will get you yet."  The deceased was the older and heavier man, but Reed the taller of the two.

Cy. Cross, for the defense, testified that, on the day of the night on which deceased was killed, the latter applied to the witness for the loan of a pistol, and in reply to question of the witness as to what he wanted with it, he said that he was going to kill Charley Reed.  At dusk he again applied for the pistol, but was again refused.  He then offered the witness fifteen dollars to assist him in killing Reed.  The witness declined, and deceased asked him to say nothing about it.

This evidence was reiterated on the cross-examination, with the further statement that the deceased said that he wanted to kill Reed that night.

Sarah Scott, for the defense, testified that the deceased came to her house a short time after supper on the night of the killing, and stayed as long as two hours.  During his stay he remarked that he had been angry with Charley Reed, but would let it pass.  When he left at a late hour he said he was going to the lumber yard to bed.  Within a half hour the witness heard the shooting.  The defendant lived near the witness, and the deceased would have necessarily passed her house in going to the lumber yard.

Riley Wilson, for the defense, testified that, on the Sunday preceding the Wednesday of the killing, the de-

ceased came to his house and saw some cartridges lying on the washstand, and asked the witness for them. The witness gave them to him. He pulled out a pocket pistol, and said that he was going to leave town, but he would kill "one d—d son of a b—h" before he left. The witness and his wife were at the house of the defendant on the night of the shooting, and before it occurred. Manda Davidson came in shortly, and they all sat there talking until a late hour. It was between ten and eleven o'clock when they left. On their way home they saw the deceased and Jake Murrell standing talking together. The witness did not speak to them as he passed them, nor they to him. There was but one outside door to the defendant's room, and the witness knocked upon it when he went there that night. He knows that it was not broken then nor was it broken when he left. The witness is not related to the defendant, but his wife and she are sisters.

E. L. Morris testified, for the defense, that at the time of the killing he was the proprietor of the Commercial Hotel, situated from sixty to one hundred yards from the defendant's house. After he retired, but before he went to sleep, he heard a noise like some one striking against the side of a house or door, which was followed by a crash, and instantly by shooting. The witness thought he heard two or three licks after the crash and just before or at the close of the shooting. They were not like the first licks but sounded more like thuds. The shooting took place while the witness was on his way from his bed to the door, and instantly a woman commenced screaming. The shooting and the screaming came from the same house, and that was the house in which the deceased was killed. The woman screamed like she was shot.

Joe Swan testified, for the defense, that he lived at the time of the killing about two hundred yards east of the

house in which White was killed.   Just before the shoot-
ing began he heard a noise like the breaking in of a door
or side of a house, and thought that his mules were
breaking out of his stable.   He got out of his bed and
ran to his west door.   The shooting began just as he
reached the door, and instantly · a woman began scream-
ing.   Adrian Underwood, who lived near, also testified to
hearing a crashing noise at the time of the shooting.

J. S. Brazelton, city marshal of Gainesville, testified
that he reached the house about half an hour after the
killing.   He found the door, which swung inwards,
broken in from the outside.   One entire panel and a cross
piece had been freshly smashed in.   There were two
wounds in the body of deceased, near together, high up
under the left arm, and within two or three inches of the
arm pit.   The doctor cut one of the balls out from in
front, and much lower down than from where it entered.

Pete Foreman, for the defense, testified that he fre-
quently visited Bill Moore's house, but denied emphatically
that Bill Moore told him on any occasion that he (Moore)
heard the defendant make threats against deceased, or say
that she would "have Frank White killed if it cost her a
law-suit in h—l."

Dick Van, for the defense, testified that, on the even-
ing before the killing, he and Reed were at defendant's
house.   Reed told him that he had bought a pistol, and
he asked to see it.   Reed took it down and the witness
was examining it when Manda Davidson came.   Reed
did not drop the pistol to his side, nor try to hide it from
her when she came in.   The defendant did not hunch
Reed, nor did she say at any time "you negroes are all
fools."   When witness finished examining the pistol,
Reed put it back where he got it from.

The State, in rebuttal, having proved the loss of the writ-
ten testimony taken before the coroner's inquest, intro-
duced W. T. Roberts, who testified in substance that he was

present at the inquest and asked the defendant, who was a witness, questions. She stated that she and deceased had made up and would live together; that he was to come to see her the night he was killed; that she had made the pallet on the floor for him and Reed to sleep on; that she was asleep at the time of the shooting and was awakened by it; that before she went to bed Reed went out of the door, and she locked it, leaving him standing on the door-step. She said she did not know how White got into the house; that when she went to sleep the door was locked, and he was not in the house.

Two or three other witnesses, in rebuttal, testified substantially as did the witness Roberts. Other matters are indicated in the opinion.

*C. L. Potter*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WINKLER, J. This appeal is from a judgment of conviction of murder in the second degree, the punishment assessed being confinement in the State penitentiary for a term of five years. The indictment charges this appellant and one Charley Reed with the murder of one Frank White, alleged to have been committed in the county of Cooke, on March 17, 1880.

From the testimony adduced on the part of the prosecution on the trial in the court below, and from bills of exception set out in the transcript, it is manifest that the State relied for a conviction upon proof of one of two positions: First, that this appellant had entered into a conspiracy with her co-defendant, Charley Reed, prior to the homicide, to take the life of the deceased; or, second, that this appellant was present at the homicide, and so participated in the killing as to render her amenable to the law as a principal to the crime of murder. There is no question that the deceased came to a violent death,

about the time and at the place alleged in the indictment. It is shown by the testimony, with at least reasonable certainty, that the deceased and the appellant were husband and wife, but that, from some cause not stated in the record, had not been living together for some time previous to the time of the killing; that the appellant, while so living apart from the deceased, had rented a room in a house in the northern portion of the town of Gainesville, Cooke county, where she was living at the time of the homicide, and that, whilst she was so living apart from her husband, her co-defendant Reed had been living with this appellant and occupying with her the same room. There was testimony tending to show that Reed occupied to the appellant the relation of a boarder with her, and that at the time of the killing there were two beds in the room; one spread upon the floor, and the other on a bed-stead. There was also testimony that the killing occurred in the night time and after the ordinary time for going to bed, but the time is not definitely stated. It was also in proof that the only outside door to the room had been violently broken in from the outside of the building; and, when persons living near by, who heard the noise occasioned apparently by the breaking open of the door and the report of two or three shots, went to the place soon after, the deceased was found in the room, dead, and the defendant sitting upon the floor, holding in her lap the head of the dead man; with some testimony to the effect that, soon after the firing had been heard, Reed was seen running rapidly away from the direction of the place where the murder, if murder it was, had been committed. There was proof of disagreement between the defendant and the deceased prior to the homicide, and there was also proof of hard feelings between the deceased and Reed, and of wordy altercations between them, and some proof of threats made by the deceased against the person and life of Reed

shortly before the killing. There was also testimony tending to show that a very short time before the killing the defendant and the deceased had compromised their differences and disagreements, and had agreed to live together again, and that the defendant had arranged for a removal, on the day after the killing, to another house in the town, where it seems the parties were to re-unite and live together.

On the subject of proof of the conspiracy between the defendant and her co-defendant Reed to take the life of the deceased, it appears that there was a heated controversy between counsel representing the respective sides of the controversy, pending the introduction of the testimony, as to whether such conspiracy had been proved or not, and wherein certain positions were taken and arguments employed by counsel representing the prosecution, to which counsel for the defendant deemed to be improper to be made in the presence of the jury, and calculated to prejudice their minds against the defendant; and the court declining to interpose, counsel for the defendant took a bill of exceptions, and this action of the court enters into the defendant's motion for a new trial, and is assigned as error committed on the trial below. This subject will be recurred to hereafter. We gather from the bills of exception and by the failure of the judge to charge the jury on this subject that in the opinion of the court the testimony did not establish a conspiracy between the defendant and Reed to take the life of the deceased; and hence we conclude from the record that the position assumed by the prosecution on the subject of such conspiracy fell to the ground and was eliminated from the trial. This action of the court inured to the benefit of the defendant in that it determined one apparent issue in the case in her favor, and whether the action of the court was strictly correct in this particular or not, the appellant ought not to be heard to complain.

It is also shown by bill of exceptions that on more than one occasion during the progress of the trial below counsel for the prosecution attempted to impeach certain of the State's witnesses by showing that they had testified in court contrary to statements made on a former trial; to which defendant's counsel objected, taking the ground that none of the emergencies had arisen which permitted a party to impeach his own witness. The matters set out in these bills of exception have direct reference to the rules of practice in the trial courts rather than to errors for which a judgment should be reversed on appeal. It is a rule of practice in this court not to revise the action of the trial courts as to matters confided to the sound discretion of the judge below, unless it is made to appear that the discretion so confided has been abused to the prejudice of the party complaining.

As to the matters set out in the bill of exceptions just referred to above, it is not perceived that the action of the court, in so far as the *ruling* on the subject under consideration is concerned, could have prejudiced the defendant, for the reason that the result of the ruling was to sustain the position contended for by the defendant's counsel, that a conspiracy had not been proved. This, however, does not meet the entire objection to the course pursued as to the latitude taken by counsel who were assisting in the prosecution and permitted them by the court, over objection by the defendant's counsel. It is contended that the argument used was calculated to create a prejudice in the minds of the jury against the defendant, and that it was used for that very purpose. If it was not used for that purpose, then we confess that we are unable to determine its object. If there was anything in the argument, if argument it can be called, which was calculated to illumine the minds of the court as to the law of the question involved, we are unable to see it. We are of opinion the course pursued was altogether out of place,

and that the court should have interfered, and that promptly, to put a stop to it by a peremptory order, to have been enforced on disobedience by the well-known powers with which the courts are armed for the enforcement of obedience to their lawful orders and rulings. This kind of proceeding is well calculated to arouse the feelings and excite the passions of those within hearing. Questions of law may and often do arise as to the admissibility of testimony, and these questions may be discussed by counsel under the control and direction of the court. In practice there can rarely be occasion for denunciation of party or witness in discussing the law at this stage of the proceedings. Whenever a question as to the admissibility of evidence is to be discussed alone to the judge, the jury should be retired out of hearing for the time. In this instance, the jury should have been taken to a place of safety until the storm of words had passed.

As to the right of a party to impeach his own witness, Mr. Wharton says (1 Wharton's Law of Evidence, § 549): "By a technical rule of the English common law, while a party may contradict his own witnesses, though this may discredit them, he is not ordinarily permitted to impeach them, even though called afterwards by the opposite side, either by general evidence, or by proof of prior contradictory statements. By calling the witness, so it is argued, a party represents him to the court as worthy of credit, or at least not so infamous as to be wholly unworthy of it; and if he afterwards attack his general character for veracity, that is not only *mala fides* towards the tribunal, but it 'would enable the party to destroy the witness if he spoke against him, and to make him a good witness if he spoke for him, with the means in his hands of destroying his credit if he spoke against him.' In this country, while a party cannot ordinarily discredit his own witness, his right to prove a case inconsistent with that stated by such witness is unquestioned, even though this discredits

the witness incidentally.   We have also held that even at common law, adverse witnesses who tell a story contradicting that which they had previously given may, on the party calling them being thus surprised, be examined as to their former statements, in all cases where it would appear that a deception has been practiced on the party examining, and that he has been guilty of no negligence or laches.   In England, the right to ask as to such former statements has been much agitated, though the weight of authority, at common law, is against the right so to impeach, unless with the limitation just expressed.   On the other hand it is urged 'that, although a party who calls a person of bad character as a witness, knowing him to be such, ought not to be allowed to defeat his testimony because it turns out unfavorable to him, by direct proof of general bad character,'— yet it is only just that he should be permitted to show, if he can, that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial; that this course is necessary as a security against the contrivance of an artful witness, who otherwise might recommend himself to a party by the promise of favorable evidence (being really in the interest of the opposite party), and afterwards by hostile evidence ruin his cause; that the rule, with the above exception, as to offering contradictory evidence ought to be the same whether the witness is called by one party or the other, and that the danger of the jury's treating the contradictory matter as substantive testimony is the same in both cases; that, as to the supposed danger of collusion, it is extremely improbable, and would be easily detected. It may be further remarked that this is a question in which not only the interests of litigating parties are involved, but also the more important general interests of truth, in criminal as well as civil proceedings; that the ends of justice are best attained by allowing free and ample scope for scrutinizing evidence

and estimating its real value; and that in the administration of criminal justice, more especially, the exclusion of proof of contrary statements might be attended with the worst consequences." So far, however, as concerns impeaching witnesses generally this view does not obtain. But a party *bona fide* surprised at the unexpected testimony of his witness may be permitted to interrogate the witness as to his previous declarations alleged to have been made by the latter, inconsistent with his testimony, the object being to probe the witness' recollection, and to lead him, if mistaken, to review what he has said. Such corrective testimony, also, is receivable to explain the attitude of the party calling the witness. But when the sole object of the testimony so offered is to discredit the witness, it will not be received."

We have copied the entire paragraph of Mr. Wharton as embracing an epitome of the general rules of the common law as well as the exceptions and modifications to general rules on the subject under consideration. Besides these common law rules we have a special provision of the Code of Criminal Procedure, which, to the extent to which it applies, is the rule of law governing the question; when it does not apply, as there is no other statutory provision on the subject, the common law rules apply. The article of the Code is as follows: "The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness." Code Crim. Proc. art. 755. To our minds, it being shown that the State's witnesses had testified on a former trial, the State had a right to suppose they would swear to the same facts on the present trial, and they having failed to do so, it was competent for counsel representing the State to inquire of the witnesses as to what different facts they had testified

to, or what contradictoy statements they had made on the former trial, for the purpose of showing surprise at the testimony, or for the purpose of probing the recollection of the witnesses and to refresh their memory, even though they had not stated facts injurious to the party calling them; and in the latter contingency they might have been impeached, under the article of the Code cited, in any other manner except by proving the bad character of the witnesses.

The fault, however, in the proceeding as we find it set out consists in the fact that it does not appear what object counsel had in view in making the inquiry of the witnesses with reference to their testimony in the previous trial, and the further fact that it does not appear that any steps whatever were taken to guard the jury against taking the supposed contradictory statements made on the former trial as evidence against the defendant on the trial then being had before the court and jury, which should have been done, and a failure to exercise this precaution was likely to have resulted prejudicially to the defendant then on trial.

On the trial below several instructions were requested by the defendant's counsel which were refused by the court, and among them the following: "Unless the jury believe from the evidence that the defendant and her co-defendant Charles Reed had conspired together to take the life of the deceased or to do him some serious bodily harm, you will disregard any acts or words of said Reed in your deliberations, for in that event you are instructed by the court that such acts and words are no evidence against the defendant."

This instruction was substantially correct to the extent it goes, but fell short of being all the law on the subject to the extent that it did not include acts done or words spoken by Reed in the presence of the defendant under any of the circumstances mentioned in the Code which

would render her guilty as a principal offender, as in such case the law of conspirators would not be the only law which would render the acts or declarations of one evidence against the other. The charge should have been given with the modification suggested, as the attention of the court had been invited to the subject.

Other errors are complained of as having occurred on the trial, some of which are regarded rather as irregularities than as errors which should be regarded as factors in determining the merits of this appeal; and others are complained of which are not likely to occur on another trial.

The testimony is voluminous and peculiar. This we have studied with care, and are constrained to say that, with the exception of some expressions of witnesses unfavorable to the defendant, made use of on direct examination and which were neutralized or done away with on cross-examination, we fail to discover any such testimony as pertinently connects the defendant with the taking of the life of the deceased, either as a co-conspirator with Reed, or as having agreed to the commission of the deed and being present at the time of its perpetration, or as connects her with the killing of the deceased sufficiently to render her liable under the law as a principal in the act or a principal offender under any of the provisions of the Code, so as to support a verdict of guilty of a felony and consign her to a felon's cell, or such as should be permitted to stand as a precedent.

Because of the meagerness and the uncertain and insufficient character of the testimony, and because of the other errors indicated, the judgment of the District Court will be reversed and the case remanded for a new trial.

*Reversed and remanded.*